UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
*Newport News Division*

UNITED STATES OF AMERICA,

v.                                                            Case No. 4:23-cr-17

IZIAHA TISDALE,

           Defendant.

### DEFENDANT'S MOTION TO DISMISS

A federal grand jury returned an indictment against Iziaha Tisdale charging him with one count of possessing a firearm on or about February 7, 2022, after having been convicted of a felony.[1] Before February 7, 2022, Iziaha Tisdale had been convicted of multiple non-violent felonies, including four grand larcenies, one embezzlement, and one hit and run. Because of these felony convictions, a federal statute purports to impose a lifetime ban on Mr. Tisdale's exercise of his constitutionally guaranteed right to bear arms. Today, Mr. Tisdale moves to dismiss the indictment because it violates the Second Amendment.[2] ECF No. 1.

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), marked a dramatic shift in Second Amendment law. Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep

---

[1] In addition to the one count of felon in possession of a firearm, Mr. Tisdale was charged and convicted in state court on related matters. Only the felon-in-possession charge was brought federal. However, all had the same date of offense: February 7, 2022. Thus, the conduct handled in state court does not serve as a basis for Mr. Tisdale being classified as a felon on February 7, 2022.

[2] Mr. Tisdale acknowledges that this Court denied a similar motion in *United States v. Finney*, No. 2:23cr13, 2023 WL 2696203 (E.D. Va. Mar. 29, 2023) (Walker, J.). Other judges in this District have considered and denied similar arguments. *See United States v. Spencer*, No. 2:22cr106, ECF No. 141, 2022 WL 17585782 (E.D. Va., Dec. 12, 2022) (Allen, J.); *United States v. Riley*, No. 1:22cr163, 2022 WL 7610264, at *6 (E.D. Va. Oct. 13, 2022) (Alston, J.). Mr. Tisdale urges this Court to arrive at a different conclusion.

and bear arms. *Bruen* rejected that approach, instructing courts to consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen*, "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era at the time of the adoption of the Second Amendment.

Under *Bruen*, the Court should dismiss the indictment charging Mr. Tisdale with possessing a firearm following a felony conviction. Because Mr. Tisdale's possession of a firearm comes within the Second Amendment's "plain text," his conduct is presumptively protected. The government will be unable to rebut that presumption as felon-disarmament laws were unknown to the generation that ratified the Second Amendment. Accordingly, Mr. Tisdale moves to dismiss the indictment charging a violation of 18 U.S.C. § 922(g)(1).

## I.   Legal Background: Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-end scrutiny.

The Second Amendment provides, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592-624 (2008). The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, colonial law and practice leading up to and immediately following 1791, and evidence of how the Second Amendment was interpreted in the century after its enactment (*e.g.*, legal treatises, pre-Civil War caselaw, post-Civil War legislation, and late-19th-

century commentary). *Id.* at 592-619. Based on this survey, the Court concluded that the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court struck down District of Columbia statutes that prohibited the possession of handguns in the home and any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed *Heller*'s "central holding": "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780 (2010). In so holding, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 767-778. That right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. But if the statute did burden Second Amendment conduct, courts then applied "the appropriate form of means-end scrutiny." *Id.* Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller* – the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the

challenger's interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

**II.   *Bruen* replaced means-end balancing with a test rooted solely in the Second Amendment's "text and history."**

The *Bruen* Court disavowed the means-end balancing developed by lower courts and, in its place, adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Bruen*, 142 S. Ct. at 2138. That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* at 2126-30, 2135 (explaining the Second Amendment "presumptively guarantees" a right to carry firearms in public and New York's proper-cause requirement burdened that right).

Where the conduct is presumptively protected by the Second Amendment, to pass constitutional muster the government must demonstrate that any regulation burdening such right "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2129-30. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. Further, if there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. In other words, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* at 2136 (emphasis in original). For that

4

reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136.[3] Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32.

Conversely, courts must "guard against giving post-enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent but should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* ("[T]o the extent later history contradicts what the text says, the text controls.").

In *Bruen*, the Supreme Court held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. While the Court did not outline a comprehensive scheme for evaluating historical evidence, it directed courts to consider distinctly similar

---

[3] The Court reserved the question whether courts entertaining challenges to state statutes should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38.

historical regulations or a lack thereof, *Id.* at 2131 (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today; directing courts to use "analogical reasoning" when confronting "present-day firearm regulations" that "were unimaginable at the founding").

Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* The *Bruen* Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

Whether based on distinctly similar precursors or historical analogues, the "comparable tradition of regulation" must be robust. *See id.* (requiring "a well-established and representative" historical analogue). A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156.

Finally, *Bruen* emphasized – repeatedly – that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127, 2130; *see also, e.g., id.* at 2141 n.11 ("But again, because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the

burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope.").

**III.     Under the *Bruen* framework, § 922(g)(1) violates the Second Amendment.**

Under *Bruen*, § 922(g)(1) violates an individual's Second Amendment right to keep and bear arms. The Amendment's "plain text" does not differentiate between convicted felons and other members of "the people," and a total prohibition on firearm possession by felons presumptively violates the Second Amendment. The government will be unable to rebut that presumption. Felon-disarmament laws, which did not appear *en masse* in this country until the 20th century, were unknown to the founding generation. As of 1791, there was no "historical tradition" of barring felons from possessing firearms, and more recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed at the time the Second Amendment was enacted.

> A.   The government will be unable to carry its burden of establishing a historical tradition of felon-disarmament laws.

*Bruen* directs courts to begin the analysis by asking whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The answer to that question is not difficult here. The Second Amendment protects the right of "the people" to "keep and bear arms." U.S. Const. amend. II. Possession of a firearm, the conduct proscribed by § 922(g)(1), easily qualifies as "keep[ing]" and "bear[ing]" arms. *See Heller*, 554 U.S. at 628-29.

Likewise, Mr. Tisdale is part of "the people" within the meaning of the Second Amendment. Just as that amendment does not "draw[ ] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it does not draw a felon/non-felon distinction. "Nothing in the Second Amendment's text" suggests that those who have been convicted of a felony are unentitled to the amendment's protection. *See id.*

7

The Supreme Court determined that the Second Amendment right – like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments – "is exercised individually and belongs to *all* Americans." *Heller*, 554 U.S. at 580. Interpreting "the people" to exclude felons would conflict with that principle. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022); *see also, e.g.*, *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) (concluding "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community"). Since *Bruen*, other courts have determined that "the people" is not a restrictive term, but rather a broad term to include all Americans. *See United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), cert. granted, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023), 61 F.4th at 453 (finding domestic violence misdemeanants are part of "the people"); *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc) (holding that "*Heller* and its progeny lead us to conclude" that felons are part of "the people"); *United States v. Connelly*, No. 22-CR-229, 2023 WL 2806324, at *4-5 (W.D. Tex. Apr. 6, 2023) (relying on *Rahimi* to conclude that an alleged marijuana user does not fall into any group that has been subjected to longstanding prohibitions on firearm possession); *United States v. Harrison*, --- F. Supp. 3d ---, 2023 WL 1771138, at *4-5 (W.D. Okla. Feb. 3, 2023) (holding that an alleged marijuana user is part of "the people"); *United States v. Bullock*, No. 3:18-CR-165, 2023 WL 4232309, at *21 (S.D. Miss. June 28, 2023) (following the *en banc* Third Circuit in *Range* and concluding that felons are part of "the people").

Because the Second Amendment's plain text covers Mr. Tisdale's alleged conduct, the Constitution presumptively protects that conduct. *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The "general societal problem" that § 922(g)(1) is

designed to address – *i.e.*, prior felons with access to guns – is one "that has persisted since the 18th century." *Id.* at 2131. As a result, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation[s]" as of 1791, when the Second Amendment was ratified. *Id.* The government will be unable to make that showing.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). Even at that late time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm possession by those convicted of crimes such as murder, rape, kidnapping, and burglary. *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011).

It was not until 1961 that congress amended the statute to prohibit "possession by *all* felons." *Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757). Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* Section 922(g)(1) "is firmly rooted in the twentieth century," *Booker*, 644 F.3d at 24, a century and a half *after* adoption of the Second Amendment. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137. Indeed, in *Bruen* the Court said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

Even if the Court broadens its focus to consider state statutes as well, § 922(g)(1) "likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." *Booker*, 644 F.3d at 23-24. In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the

thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142. Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009) (explaining the earliest state laws disarming felons appeared in New York in 1897, Illinois in 1919, New Hampshire, North Dakota, and California in 1923 and Nevada in 1925).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009); *see also* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War."). As one court recently put it, "Whether this Nation has

a history of disarming felons is arguably unclear – it certainly isn't clearly 'longstanding.'" *United States v. Quiroz*, No. 22cr104, 2022 WL 4352482, at *7 (W.D. Tex. Sept. 19, 2022).

In short, there was no "historical tradition," circa 1791 of gun regulations "distinctly similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31. To the contrary, the Federalist Papers and the Uniform Militia Act of 1792 demonstrate widespread entitlement to firearm possession – that did not exclude felons – in the 1790's. In Federalist Paper No. 46, Madison wrote that the advantage "Americans possess over the people of almost every other nation" was "being armed[.]" The Federalist No. 46 at 247 (G. Cary ed. 2001) (J. Madison). The Militia Act of 1792 provided that each and every white male within a specified age range shall be enrolled in the militia and once enrolled "provide himself with a good musket of firelock" rifle. The Uniform Militia Act, 1 Stat. 271 (1792). While the Act goes on to exempt certain persons from service and weapon possession, those previously convicted of crimes are not included. *Id.* An entitlement to firearm possession is deeply rooted in the American tradition.[4] The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by violent felons. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.*

Nor can the government attempt to justify § 922(g)(1) by resorting to "analogical reasoning." *Id.* at 2132. According to *Bruen*, that mode of analysis is available only when a Second Amendment challenge "implicat[es] unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at the founding." *Id.* But the potential

---

[4] During the founding area there was, apparently, "historical misappropriation of law to pretextually and unlawfully disarm unfavored groups." *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *11 (W.D. Tex. Sept. 19, 2022) (citing to laws that disarmed "slaves and free blacks") (appeal filed). However, the Fourteenth Amendment passed in 1868 clearly rejected the notion that constitutional rights are limited to a particular group within the United States. U.S. Const. amend. XIV.

danger posed by felons' access to firearms would have been neither unprecedented nor unimaginable to the Founders. As a result, the government cannot rebut the presumption of unconstitutionality by identifying a "historical analogue" to § 922(g)(1). *Id.* at 2133.

Even if analogical reasoning were appropriate in this case, however, it would not aid the government. Mr. Tisdale is unaware of a historical tradition of founding-era statutes that are "relevantly similar" to § 922(g)(1). *Id.* at 2132. The government will therefore be unable to shoulder its burden of rebutting the presumption of unconstitutionality.

B. *Heller*'s statements about "presumptively lawful regulatory measures" and "law abiding, responsible citizens" do not control.

Mr. Tisdale expects the government will attempt to sidestep the straightforward *Bruen* analysis by relying on two passages (one on presumptively lawful regulatory measures and the other on law abiding, responsible citizens) from *Heller* to argue that felons are outside the protection of the Second Amendment. Neither passage justifies ignoring the clear framework outlined in *Bruen* and neither can save § 922(g)(1).

First, Mr. Tisdale is cognizant that the *Heller* Court wrote both that the Second Amendment right "is not unlimited" and that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" among other provisions. *Heller*, 554 U.S. at 626-27. In other cases, the government has argued this portion of *Heller* establishes that felon-disarmament laws are consistent with the Second Amendment. That view is mistaken. The question of felon-disarmament laws' constitutionality was not before the Court in *Heller*, and any statements in the opinion addressing that question are therefore dicta. *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *see also, e.g., Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 686-87 (6th Cir. 2016) (en banc) (describing *Heller*'s "presumptively lawful" language as "dictum").

Lower courts "are not bound by dicta or separate opinions of the Supreme Court." *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). And the Fourth Circuit generally

declines to follow Supreme Court dicta that is "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008); *see also id.* at 283 (refusing to "afford[] talismanic effect" to unexplained Supreme Court dicta).

*Heller*'s discussion of "presumptively lawful regulatory measures" is the kind of Supreme Court dicta unentitled to "talismanic effect." It was unaccompanied by any analysis and was – at best – peripheral to the questions at issue. While the *Heller* Court described felon-disarmament laws as "longstanding," 554 U.S. at 626, it "never actually addressed the historical pedigree" of those laws, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting); *see also United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) (*"Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons."). But as explained above, felon-disarmament laws are *not* longstanding – at least not in the sense that *Bruen* would use that term.

Finally, even if the *Heller* dicta might once have warranted deference, it no longer does today. It may be true that "nothing in [*Heller*] cast doubt on longstanding prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, but *Bruen*'s new framework *does* cast doubt on such laws.

Second, the *Heller* Court wrote "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. This statement does not limit Second Amendment rights to only law-abiding, responsible citizens. Rather, it established a baseline: at the very least, law abiding, responsible citizens have a right to possess firearms.[5]

---

[5] Mr. Tisdale is aware that at times *Bruen* repeats *Heller*'s "law-abiding citizens" formulation. *E.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the Fourteenth Amendment

Clearly, law-abiding responsible citizens have a protected Second Amendment right; what other rights are protected the *Heller* Court left to "future evaluation." *Id.* For those reasons, the *Heller* dicta does not preclude Mr. Tisdale's claim.



In sum, the Second Amendment broadly protects Americans' right to bear arms, not just a select subset of Americans. Post-*Bruen*, courts must conduct a historical inquiry to determine whether it has real historical support for a comparable tradition of regulation near the Founding, rather than rely on presumption or dicta. The general ban on felons possessing firearms under § 922(g)'s violates the Second Amendment. For this reason, the Court should dismiss the indictment.

Respectfully submitted,

IZIAHA TISDALE

By:_____/s/_____
Lindsay J. McCaslin
Virginia State Bar No. 78800
Assistant Federal Public Defender
Office of the Federal Public Defender
500 E. Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: 757-457-0800
Telefax: 757-457-0880
Email: Lindsay_mccaslin@fd.org

---

in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). But that is because the petitioners alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of *petitioners'* license applications violated the Constitution." *Id.* at 2124-25 (emphasis added). No other questions were before the Court in *Bruen*. *Heller*'s description of the right to bear arms "in the home" does not mean the Second Amendment is inapplicable to other *places*, and the same is true here: *Bruen*'s description of "law-abiding citizens" does not mean the Second Amendment is inapplicable to other *people*.