## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### *Newport News Division*

**UNITED STATES OF AMERICA,**

**v.**

**IZIAHA TISDALE,**

**Defendant.**

**Criminal No. 4:23-cr-17**

## RESPONSE OF THE UNITED STATES TO
## DEFENDANT'S MOTION TO DISMISS

The United States of America, through its attorneys, Jessica D. Aber, United States Attorney, and Julie D. Podlesni, Assistant United States Attorney, hereby responds in opposition to Defendant's Motion to Dismiss [ECF No. 17]. This Court in particular has already rejected similar arguments made by other defendants in *United States v. Spencer, et al.*, 2022 WL 17585782, 2:22-cr-106 (E.D. Va. Dec. 12, 2022). Moreover, the argument in the instant motion is almost identical to that presented to another judge in this District in *United States v. Tamonte Finney*, 2:23-cr-13. *See Finney*, ECF No. 17. While the motion in this case declines to continue advancing the argument in that motion's Section IV with respect to whether 18 U.S.C. § 922(g) can be severed or reinterpreted to comport with a ban on violent felons, it does update its overall discussion to cite new opinions from two other United States Circuit Courts of Appeals: *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), and *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc), and other cases from district courts outside of the Fourth Circuit.

Significantly, though, neither *Rahimi* nor *Range* change the analysis this Court already undertook in *Spencer*, nor the in-depth view taken in *Finney*. In *Rahimi*, not only was the Fifth Circuit dealing with an entirely different prohibition (under § 922(g)(8) relating to protective

orders), but it actually cited with approval the upholding of distinguishing between felons and law-abiding, responsible citizens with respect to presumptive approval of disarmament. *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) (*citing Range*). Moreover, just two weeks ago, the Eighth Circuit, in a much more analogous case, *United States v. Dunn*, No. 22-2539, 2023 WL 5065149, at *3 (8th Cir. Aug. 9, 2023), rejected this very argument and reinforced the widely accepted holding that nothing in the *Bruen* decision indicates that the felon-in-possession statute is unconstitutional and there is "no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *Id. citing United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023), *petition for reh'g filed*, No. 22-2870 (8th Cir. July 14, 2023).

In the seven short years since Defendant became an adult in 2016, he has been arrested or criminally charged more than _forty_ times (almost thirty of which resulted in convictions), largely for financial crimes (*e.g.*, embezzlement and grand larceny), for crimes of intimate partner or other violence (*e.g.*, strangulation resulting in injury, brandishing a firearm, and assault and battery of a family member); and for judicial process crimes (*e.g.*, contempt/failure to appear, obstruction of justice, identity theft to avoid arrest, probation revocations). Even excluding all misdemeanor convictions or felony convictions that were not yet final when he was arrested for the February 7, 2022, firearm possession charged in the sole count of the Indictment [ECF No. 1], Defendant still had accrued at least _eight_ felony convictions: four grand larceny convictions in 2017 and 2019, a 2019 attended vehicle hit-and-run, and three felony probation revocations in 2019 and 2020.[1]

---

[1] *See*, *Commonwealth v. Iziaha Tisdale*, Newport News Circuit Court cases CR16001461-00–01 (Grand Larceny – Solicit Juvenile & Revocation); CR19000147-00–01 (Grand Larceny>$200 & Revocation); CR19000148-00–01 (Grand Larceny>$500 & Revocation); and Hampton Circuit Court cases CR19000089-00 (Grand Larceny> $200) and CR19001283-00 (Felony Hit-and-Run >$1000). For misdemeanor convictions and other arrests, see Isle of Wight General District Court cases GC16002808-00–01 and GC16005076-00–01; Danville General District Court cases GC21003020-00 and -021-00; Hampton General District and Circuit Court cases GC19019088-

Defendant had been advised repeatedly that he was forbidden from possessing firearms, and he is precisely the kind of person whose presumptive disarmament is historically approved. Therefore Defendant's Motion to Dismiss should be denied.

## BACKGROUND

There was no ambiguity on either date regarding the unlawfulness of firearm possession by a person who, like the defendant, knew that he had previously been convicted of a felony. Every prior attempt to challenge § 922(g)(1)'s constitutionality facially had failed at the time the defendant was caught with a firearm in June 2022, and to this day, "no circuit has held the law unconstitutional as applied to a convicted felon." *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir. 2019).

More recently, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), a progeny of the Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010). In those two cases, the Court recognized that the Second and Fourteenth Amendments protect the right of "an ordinary, *law-abiding* citizen to possess a handgun in the home for self-defense." 142 S. Ct. at 2122 (emphasis added). In *Bruen*, the Court extended those holdings, concluding that such "ordinary, law-abiding citizens" have the right to carry a handgun for self-defense outside the home as well. *Id.* In so ruling, the Court did nothing, either explicitly or implicitly, to call into question the constitutionality of longstanding federal laws barring certain categories of non-

---

00, GT19019418-00—419-01, CR19A00089-00 & -1283-00, CR22000301-00; Newport News Juvenile & Domestic Relations, General District, and Circuit Court cases JA111111-01-01–02, GC16004195-00, GC16008124-00, GC16008131-00, GC17004125-00, GC18009004-00, GC18009075-00, GC19002556-00–01—2557-00, CR17T00153-00, CR19000147-02 & -148-02, CR22000682-01, and CR22000772-01–05; and Portsmouth Juvenile & Domestic Relations and General District Court cases JA050360-01-00 and GC17002180-00.

law-abiding individuals from possessing firearms. *See id.* at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm[,] . . . [n]or have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the 'longstanding prohibitions on the possession of firearms by felons' [discussed in *Heller* and *McDonald*]." (quoting *Heller*, 554 U.S. at 626)).

Notwithstanding that *Bruen* resolved the constitutionality of a state regime governing the issuance of concealed-carry licenses to indisputably law-abiding citizens, the defendant, a decidedly non-law-abiding person once more under indictment, contends that the methodological framework employed by the Court in *Bruen*, when applied to § 922(g)(1), compels that statute's invalidation. He is wrong. *Bruen* reiterated *Heller*'s recognition that the right to bear arms belongs only to "law-abiding, responsible citizens." *Id.* at 2131 (quoting *Heller*, 554 U.S. at 635). As Justice Kavanaugh and Chief Justice Roberts emphasized in concurrence, *Bruen* leaves undisturbed the Court's previous approval of "longstanding prohibitions on the possession of firearms by felons[.]" *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626). Thus, a felony conviction removes one from the Second Amendment's protection. And even if that were not so, § 922(g)(1) would still be valid because it is consistent with this country's historical tradition of firearm regulation. For these reasons, and because in any event *Bruen* did not overrule binding, post-*Heller* Fourth Circuit precedent upholding the constitutionality of § 922(g)(1), the defendant's motion to dismiss should be denied.

## LEGAL LANDSCAPE

Before addressing the merits of the defendant's motion, it is necessary to describe the

legal backdrop against which it arises.

## I.      Statutory Regulations on Firearm Possession

"Section 922(g)(1) makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1).

The federal prohibition in § 922(g) has existed in some form since 1938, when Congress first limited gun access by convicted felons. *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011); *see United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (noting "first federal statute disqualifying felons from possessing firearms was not enacted until 1938"). The original federal prohibition reached only those under indictment for or convicted of crimes of violence. *Laurent*, 861 F. Supp. 2d at 82 (citing Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed)). In 1961, Congress expanded the prohibitions to include those convicted of all crimes. *Id*. at 83. Congress later passed the Gun Control Act of 1968, which added restrictions on those under felony indictment and maintained the prohibition related to convicted felons. *Id*. "In 1986, Congress again revised the statute to combine the provisions of § 922(g)(1) and (h)(1) that dealt with indictees into a single section, § 922(n)." *Id*. at 84. The statutory text has not substantively changed since then.

## II.     The Second Amendment and Its Interpretation

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court recognized that the

Second Amendment protects the right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. 554 U.S. at 635. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable. *Id*. at 628–34.

"Like most rights," however, *Heller* emphasized that "the right secured by the Second Amendment is not unlimited." *Id*. at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. The Court made clear that its *Heller* opinion should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626–27; *see also McDonald*, 561 U.S. at 786 (reiterating same). Heller described these regulations as "presumptively lawful" measures. 554 U.S. at 627 n.26.

Following *Heller*, the Fourth Circuit developed a two-step "framework" for deciding Second Amendment challenges. *United States v. Chester*, 628 F.3d 673, 678 (4th Cir. 2010), *abrogated in part by Bruen*, 142 S. Ct. 2111. First, a court would ask whether "the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id*. at 680 (internal quotation marks omitted). That is, was "the conduct at issue . . . understood to be within the scope of the right at the time of ratification"? *Id*. If the answer was no, the challenged law was valid. *Id*. If, however, the challenged regulation burdened conduct that fell within the scope of the Second Amendment as historically understood, then the court would "move to the second step of applying an appropriate form of means-end scrutiny"—*i.e.,* strict or intermediate scrutiny. *Id*.

In *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012), the Fourth Circuit held that "the *Chester* analysis is more streamlined" in cases involving firearms regulations deemed "presumptively lawful" in *Heller*. That is, a presumptively lawful regulation could not violate the Second Amendment unless it proscribed conduct "fall[ing] within the category of . . . '*law-abiding responsible* citizens . . . us[ing] arms in defense of hearth and home.'" *Id.* at 319 (quoting *Heller*, 554 U.S. at 635). Among the firearms regulations specifically enumerated as presumptively lawful in *Heller* are the "longstanding prohibitions on the possession of firearms by felons[.]" 554 U.S. at 626. In *Moore*, the defendant, a multi-time convicted felon, argued that the presumptively lawful felon-in-possession prohibition under § 922(g)(1) is facially unconstitutional because it infringes on the basic right of self-defense. 666 F.3d at 316. The Fourth Circuit had "no difficulty" rejecting the defendant's challenge: "[s]ince clearly there are cases where felon firearm possession is constitutionally limited, § 922(g)(1) survives a facial challenge." *Id.* at 319.[2] Notably, under its streamlined *Chester* analysis, the court eschewed the application of means-end scrutiny to reach that result.

In *United States v. Pruess*, 703 F.3d 242, 244 (4th Cir. 2012), the Fourth Circuit took up a similar challenge to the constitutionality of § 922(g)(1) brought by an assertedly non-violent felon. Like the defendant in *Moore*, however, the defendant in *Pruess* could not "rebut the presumption of lawfulness of the felon-in-possession prohibition as applied to him." *Id.* at 246.

___

[2] The defendant in *Moore* also brought an as-applied challenge to § 922(g)(1), in which he "relie[d] heavily on his assertion that he was carrying a firearm on the day he was arrested to protect himself from being robbed in his sketchy neighborhood." 666 F.3d at 319. The Fourth Circuit rejected this argument, too, noting that the defendant "simply does not fall within the category of citizens to which the *Heller* court ascribed the Second Amendment protection of 'the right of *law-abiding responsible* citizens to use arms in defense of hearth and home.'" *Id.* (quoting *Heller*, 554 U.S. at 635).

As in *Moore*, the court concluded without a full *Chester* analysis that the defendant's conduct fell "outside the scope of the Second Amendment's protection." *Id.*[3]

A decade after *Pruess*, the Supreme Court decided *Bruen*. There, the Court "made the constitutional standard endorsed in *Heller* more explicit[.]" 142 S. Ct. at 2134. It elaborated on the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must *then* justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30 (emphasis added). Only after the government makes that showing "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 n.10 (1961)).

The *Bruen* Court recognized that the first step of analyzing the "plain text" of the Second Amendment "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history" *Id.* at 2127. However, the Court rejected the post-*Heller* test that had developed among the circuit and district courts at the second step of the analysis, in which courts applied means-end scrutiny to laws regulating conduct that was found

---

[3] Because the presumption of constitutionality from *Heller* and *Moore* governed, the Fourth Circuit in *Pruess* determined there was no need to analyze the historical scope of the Second Amendment right. 703 F.3d at 247 n.3. The court observed, however, that the defendant erred "in suggesting that historical sources weigh in his favor." *Id.* On the contrary, there is "substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'" *Id.* The court went on to note that "our sister circuits have consistently upheld applications of § 922(g)(1) even to *non-violent* felons." *Id.* at 247.

to fall within the Second Amendment's "plain text." *Id.* Instead, the Court held that an analysis of the "Nation's historical tradition of firearm regulation," not means-end scrutiny, was the appropriate standard at the second step. *Id.* at 2130.

To determine whether a particular regulation is "consistent with the Nation's historical tradition of firearm regulation," courts should consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131–32 (quoting *Heller*, 554 U.S. at 631). The inquiry will often require "reasoning by analogy." *Id.* at 2132. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar," including both in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33 (internal quotation marks omitted). Because self-defense lies at the core of the Second Amendment, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767). Significantly, however, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133.

Applying this constitutional standard, the *Bruen* Court invalidated a New York licensing law that allowed an applicant to obtain a license to carry a gun outside his home only upon proving "proper cause exists." *Id.* at 2123. First, the Court held that the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 2134.

This, the Court concluded, fell within "the right to keep and bear arms." *Id.*

The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry," the Court concluded that the "respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th-century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

*Bruen* thus rejected the means-end scrutiny framework most courts had relied upon to assess the constitutionality of gun regulations. It did not, however, invalidate § 922(g)(1). Nor did it entirely abrogate the Fourth Circuit's post-*Heller* body of law concerning the Second Amendment.

## ARGUMENT

The defendant argues § 922(g)(1) is facially unconstitutional because its prohibitions are not deeply rooted in this country's history. He faces a heavy burden: "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Section 922(g)(1) proscribes conduct outside the scope of the Second Amendment and is sufficiently analogous to historical regulations to be deemed longstanding. Section 922(g)(1) is constitutional, and the defendant's motion to dismiss (ECF No. 17) should be denied.

I.     **The defendant's facial challenge to § 922(g)(1) fails because Fourth Circuit precedent requires denial, convicted felons retain no Second Amendment rights, and § 922(g)(1) is consistent with the nation's history and traditions.**

a.   Binding Fourth Circuit precent requires the denial of the motion to dismiss

In *Heller*, the Supreme Court recognized an individual right under the Second Amendment to keep and bear arms with the explicit limitation that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" 554 U.S. at 626. The Court went on to describe regulations prohibiting felons from possessing firearms as "presumptively lawful," *id.* at 627 n.26, and explained that "there will be time enough to expound upon the historical justifications" for such a prohibition, *id.* at 635; *see also McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons[.]" (internal quotation marks omitted)).

Relying on *Heller*, the courts of appeals, including the Fourth Circuit, have uniformly upheld the constitutionality of § 922(g)(1). *See Pruess*, 703 F.3d at 247 ("We now join our sister circuits in holding that application of the felon-in-possession prohibition to allegedly non-violent felons . . . does not violate the Second Amendment."); *Moore*, 666 F.3d at 316–17 (noting "the unanimous result reached by every court of appeals that § 922(g)(1) is constitutional, both on its face and as applied," and joining those courts by holding "§ 922(g)(1) to be a constitutionally valid statute"); *see also Hamilton*, 848 F.3d at 626 ("[W]e simply hold that conviction of a felony necessarily removes one from the class of law-abiding, responsible citizens for the purposes of the Second Amendment[.]" (internal quotation marks omitted)).

Unless and until *Moore* and *Pruess* are overruled, either by the Supreme Court or the Fourth Circuit sitting en banc, they bind this Court. *See United States v. Collins*, 401 F.3d 212,

219 (4th Cir. 2005) ("A decision of a panel of this court becomes the law of the circuit and is binding . . . unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court." (quoting *Etheridge, v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090 (4th Cir. 1993))). Plainly, no decision has purported to expressly overrule Moore and Pruess. The question, then, is whether Bruen effectively overruled those precedents—in other words, whether Bruen "clearly undermined," *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998), or "specifically rejected," *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011), the reasoning on which they were based.

*Bruen* did no such thing. Not only did the Supreme Court reaffirm *Heller* in *Bruen*, thereby effectively reaffirming *Moore* and *Pruess*, but eight members of the *Bruen* Court—six in *Bruen* itself—have made clear that statutes like § 922(g)(1) are constitutional and supported by history. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id*. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including 'longstanding prohibitions on the possession of firearms by felons[.]'" (quoting *Heller*, 554 U.S. at 626)); *id*. at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding [permitting felons to be prohibited from possessing firearms].").[4]

Two years earlier, Justice Thomas—who authored the majority opinion in *Bruen*—and Justice Gorsuch recognized that "history supported the constitutionality of some laws limiting

---

[4] Although the majority opinion in *Bruen* did not address the issue specifically, it did say that its holding was "in keeping with *Heller*." 142 S. Ct. at 2126. In *Heller*, the Court observed that the "core" of the Second Amendment right is the "right of *law-abiding*, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 634–35 (emphasis added)).

the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals." *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540–41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting). In short, eight of the nine members of the *Bruen* Court have explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes.

Moreover, nothing in *Bruen* undercuts *Moore* and *Pruess*. *Bruen*, as mentioned above, was concerned with the viability of the two-step "means-end scrutiny" test. 142 S. Ct. at 2125–27. It held that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context"; rather, the "firearms regulation [must be] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. But critically, the Fourth Circuit did not employ means-end scrutiny in *Moore* or *Pruess*; instead, it applied *Heller* to uphold the constitutionality of § 922(g)(1). And as the Supreme Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* were supported by history. *See Bruen*, 142 S. Ct. at 2128 (explaining that in *Heller*, the Court "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right"); Heller, 554 U.S. at 626, 635 (acknowledging that permissible regulations, including the "longstanding prohibitions on the possession of firearms by felons," were supported by "historical analysis" and "historical justifications"). Thus, by following *Heller*, the Fourth Circuit necessarily upheld § 922(g)(1) because such a regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

By reaffirming *Heller*, and counseling courts to adhere more closely to it, *Bruen* effectively reaffirmed *Moore* and *Pruess*, which drew directly from *Heller*. *See United States v. Ingram*, No. CR 0:18-557, 2022 WL 3691350, at *2 (D.S.C. Aug. 25, 2022) ("The Court agrees

with the government that *Bruen* clarified and 'reiterated[,]' rather than modified, the constitutional ruling in *Heller*, in the face of lower court rulings that failed to comport with its intended holding." (alteration in original)). Accordingly, this Court is bound by *Moore* and *Pruess* to affirm the constitutionality of § 922(g)(1). The defendant's motion should be denied for this reason alone.

b. <u>Convicted felons retain no Second Amendment rights</u>

Even if *Moore* and *Pruess* were not controlling and this Court were to engage in the twostep *Bruen* analysis, the defendant's motion to dismiss the § 922(g)(1) count would still fail. As an initial matter, that is because convicted felons, like the defendant, do not have a Second Amendment right to possess firearms.

In his motion, the defendant sketches out a syllogism: the Second Amendment protects the right of "the people" to "keep and bear arms"; as a citizen, he is indisputably part of "the people," irrespective of his status as a convicted felon, and possession of a firearm easily qualifies as "keep[ing] and bear[ing] arms"; ergo, the Constitution presumptively protects his possession of a handgun. The problem with this argument, however, is that it proceeds from a faulty premise—namely, the defendant's construction of "the people" to encompass literally all persons. This reading, which ignores the Supreme Court's command to examine "the Second Amendment's text, *as informed by history*," 142 S. Ct. at 2127 (emphasis added), is incorrect.

"[T]he people," as employed in the Second Amendment and throughout the Constitution, is a "term of art." *United States v. Collette*, No. 22-CR-00141, 2022 WL 4476790, at *5 (W.D. Tex. Sept. 25, 2022). In *Heller*, the Court observed that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all *members of the political community*, not an unspecified subset." 554 U.S. at 580 (emphasis added). Thus, under

Heller's definition, "the people" means only those with political rights. History supports this definition. For example, "at the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called 'political rights.'" *Collette*, 2022 WL 4476790, at *5 (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (Yale University Press 1998)); *cf. United States v. Portillo-Munoz,* 643 F.3d 437, 440 (5th Cir. 2011) (holding that Second Amendment rights do not extend to undocumented immigrants because they are not among "the people"). If, as has long been the case in this country, convicted felons can be excluded from "the people" with the power to vote under Article I, Section 2 of the Constitution, "it would also be constitutional then to exclude those [persons] from the Second Amendment's kindred 'political right.'" *Collette*, 2022 WL 4476790, at *6; *see also id.* at *7 ("[T]his Nation has a historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and powers of 'the people'").

This squares with *Heller*, which defined the right to bear arms as belonging to "law-abiding, responsible citizens." 554 U.S. at 635; see also *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) (explaining that under *Heller*, "the right to keep and bear arms depends not only on the purpose for which it is exercised but also on relevant characteristics of the person invoking the right"). Consistent with that definition, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" *Id.* at 626. The Court described such prohibitions as "presumptively lawful" and falling within "exceptions" to the protected right to bear arms. *Id.* at 627 n.26, 635.[5] In *McDonald*,

---

[5] The defendant dismisses *Heller*'s description of prohibitions on the possession of firearms by felons as "presumptively lawful," asserting that it is merely dicta that can and should be disregarded. ECF No. 17 at Pg 11-12. Not so. Lower courts are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *United*

a plurality of the Court repeated its "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons[.]'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626).

*Bruen* bolsters the conclusion that the Second Amendment does not extend to possession of firearms by convicted felons. See 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional (quoting *Heller*, 554 U.S. at 626)).[6] Indeed, *Bruen* repeatedly described the Second Amendment as limited to "law-abiding" citizens. *Id*. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. Consistent with that principle, *Bruen* approved "'shall-issue' licensing regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id*. at 2138 n.9. In doing so, the Court had no need to analyze the history of shall-issue licensing regimes. Such regimes generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens.'" *Id*. (quoting *Heller*, 554 U.S. at 635). This reasoning underscores that § 922(g)(1)—which also aims to ensure that "those bearing arms" are "law-abiding, responsible citizens"—accords with the Second Amendment. *Id*.

As several courts of appeals have recognized, any offense serious enough to satisfy § 922(g)(1)—that is, a "crime punishable by imprisonment for a term exceeding one year"— necessarily excludes its perpetrator from the class of law-abiding citizens protected by the Second

---

*States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)). Here, of course, the Court in *Bruen* reinforced, rather than weakened, the presumptive lawfulness of felon-in-possession laws.

[6] Because the votes of Justice Kavanaugh and Chief Justice Roberts were necessary to form the *Bruen* majority, the limits underscored by their concurrence are binding to the extent that the Court's opinion might otherwise be construed more broadly. *Cf. United States v. Davis*, 825 F.3d 1014, 1021–22 (9th Cir. 2016) (en banc).

Amendment. *See, e.g., United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009). And as another district court from this Circuit aptly summarized:

> By distinguishing non-law-abiding citizens from law-abiding ones, the dicta in Heller and McDonald clarifies the bounds of the plain text of the Second Amendment. This, coupled with the majority's focus in Bruen on the Second Amendment rights of "law-abiding citizens" throughout the opinion convinces this Court that the Supreme Court would conclude that [§ 922(g)(1)] fail[s] to infringe on any Second Amendment rights.

*Ingram*, 2022 WL 3691350, at *3.

The Second Amendment permits Congress to disarm individuals based on their status as convicted felons. Therefore, § 922(g)(1) does not burden a constitutional right, and it is facially constitutional.

      c.   <u>Section 922(g)(1) is consistent with this nation's tradition of disarming individuals who pose a risk to society</u>

Even if the Supreme Court had not already defined the Second Amendment in a way that excludes the right of convicted felons to possess firearms, the defendant's facial challenge still fails because § 922(g)(1) fits comfortably within the nation's longstanding tradition of disarming unvirtuous, irresponsible, and/or dangerous citizens. *See Binderup v. Att'y Gen.*, 836 F.3d 336, 349 (3d Cir. 2016) (en banc) ("The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era."), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. As the Fourth Circuit has recognized, "[p]laced in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has *always* recognized and accommodated limitations for persons perceived to be dangerous." Carter, 669 F.3d at 415 (emphasis added); *accord United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) ("[H]istorical evidence support[s] the notion that the government could disarm individuals who are not law-abiding members of the political community.").

-17-

For centuries, the gun rights of certain groups have been categorically limited to promote public safety. *Heller* identified the right protected by the 1689 English Bill of Rights as "the predecessor to our Second Amendment." 554 U.S. at 593. That document provided that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Both before and after its adoption, the English government retained the power to disarm individuals it viewed as dangerous. *See Carpio-Leon*, 701 F.3d at 980.

Thomas Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868), *available at* https://heinonline.org/HOL/Page?collection=beal&handle=hein.beal/tcl1868&id=77&men_tab =srchresults. The Second Amendment incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible," *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011), and "does not preclude laws disarming the unvirtuous (i.e. criminals)," *id.* (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue,* Law & Contemp. Probs., at 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right. Such a right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

As the Fourth Circuit has already recognized, "[m]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm unvirtuous citizens." *Carpio-Leon*, 701 F.3d at 979 (internal quotation marks omitted); *see also United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (collecting scholarly sources). The court explained that "felons 'were excluded from the right to arms' because they were deemed unvirtuous." *Carpio-Leon*, 701 F.3d at 980 (quoting Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)).

Historical records support this conclusion. "*Heller* identified . . . as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *Skoien*, 614 F.3d at 640 (quoting 554 U.S. at 604). That report recognized that the government could disarm potentially dangerous or irresponsible people, stating that "citizens have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.'" *Id*. (emphasis added) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971), *available at* https://heinonline.org/HOL/Page?collection=beal&handle=hein.beal/blorhs0002&id=67&men_tab=srchresults). "Many of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Skoien*, 614 F.3d at 640.

Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwartz, *The Bill of Rights* 681 (emphasis added). Ultimately, Adams's proposed amendment was rejected, but "not because early Americans objected to the limitations

on the right to bear arms included therein." *United States v. Coombes*, No. 22-CR-00189, 2022 WL 4367056, at *7 (N.D. Okla. Sept. 21, 2022). Instead, "the failure of the proposed amendment[] is properly attributed to a lack of support by Federalists, who were in the majority in some early ratifying states, for inclusion of a bill of rights as a whole." *Id*. Likewise, "although some scholars have pointed out that the Second Amendment as ratified did not explicitly limit the right to virtuous or peaceable persons or exclude felons, other scholars have suggested that no objection was made because the exclusions were understood." *Id*. (citing Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms*, 273 (2008)).

Ultimately, as the Seventh Circuit has suggested, "felons were not historically understood to have Second Amendment rights." *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *see also id*. at 446 (observing that "most scholars" have concluded that even "nonviolent felons . . . fall outside the scope of the Second Amendment").

In this respect, the right to bear arms is, as previously mentioned, analogous to civic rights that have historically been subject to forfeiture by individuals convicted of crimes. *See Binderup*, 836 F.3d at 349 ("[P]ersons who have committed serious crimes forfeit the right to possess firearms in much the way they forfeit other civil liberties[.]" (internal quotation marks omitted)). This includes the right to vote, *see Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), and the right to serve on a jury, see 28 U.S.C. § 1865(b)(5). Just as Congress and the States have required persons convicted of felonies to forfeit civic rights, § 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction[.]" *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring).

Statutes disarming persons considered a risk to society, such as convicted felons, are well

known to the American legal tradition. Section 922(g)(1), which, like all statutes, is "presumed constitutional," *Faircloth v. Finesod*, 938 F.2d 513, 516 (4th Cir. 1991), is consistent with that longstanding tradition. The defendant's claim that § 922(g)(1) unconstitutionally infringes on a Second Amendment right should therefore be rejected.

"Federal courts nationwide have rejected . . . facial constitutional challenges to the felon-in-possession statute." *United States v. Burrell*, No. 21-20395, 2022 WL 4096865, at *3 (E.D. Mich. Sept. 7, 2022).[7] Indeed, as of this memorandum's submission, no court has invalidated § 922(g)(1) in *Bruen*'s aftermath. "Relying on the same dicta in the wake of *Bruen*, at least nine federal district courts have rejected constitutional challenges to Section 922(g)(1)." *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *8 (S.D.W. Va. Oct. 12, 2022).

## CONCLUSION

For the reasons stated, the defendant's motion to dismiss the indictment should be denied.

---

[7] *See, e.g.*, *United States v. Charles*, No. 22-CR-00154, 2022 WL 4913900, at *12 (W.D. Tex. Oct. 3, 2022); Order, *United States v. Jaime Perez*, No. 3:21-cr-508 (S.D. Cal. Sept. 26, 2022), ECF No. 78; *Collette*, 2022 WL 4476790, at *8; Order, *United States v. Michael Angelo Delpriore, Jr.*, No. 3:18-cr-136 (D. Alaska Sept. 23, 2022), ECF No. 287; *Coombes*, 2022 WL 4367056, at *10; *United States v. Cockerham*, No. 5:21-cr-6, 2022 WL 4229314, at *2 (S.D. Miss. Sept. 13, 2022); *United States v. Jackson*, No. 21-51, 2022 4226229, at *2 (D. Minn. Sept. 13, 2022); Order, *United States v. Joshua Doty*, No. 5:21-cr-21 (S.D.W. Va. Sept. 9, 2022), ECF No. 34; Minute Entry, *United States v. Justin Patterson*, No. 7:19-cr-231 (S.D.N.Y. Sept. 9, 2022) (reflecting oral bench ruling); *Ingram*, 2022 WL 3691350, at *3; Order, *United States v. Vertis Alvin Nevens*, No. 2:19-cr-774 (C.D. Cal. Aug. 15, 2022), ECF No. 121; Courtroom Minutes, *United States v. Maurice Deshawn Farris*, No. 1:22-cr-149 (D. Colo. Aug. 12, 2022), ECF No. 29; *see also United States v. Nutter*, No. 2:21-CR-00142, 2022 WL 3718518, at *8 (S.D.W. Va. Aug. 29, 2022) ("This Court has not identified any district court that has granted a similar motion to dismiss any criminal charge under Section 922(g), to date.").

<u>CONCLUSION</u>

WHEREFORE, the United States respectfully requests that the Court deny the defendant's

Motion to Dismiss Count Two [ECF No. 28].

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____ /s/ _____
Julie D. Podlesni (VSB No. 77198)
Assistant United States Attorney
Office of the United States Attorney
721 Lakefront Commons, Suite 300
Newport News, Virginia 23606
Tel. (757) 591-4000 | Fax (757) 591-0866
Julie.Podlesni@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 24th day of July, 2023, I filed a copy of the foregoing with the
Clerk of Court via CM/ECF, which will send a notification to counsel.

_____ /s/ _____
Julie D. Podlesni
Assistant United States Attorney